RALSTON PURINA COMPANY,
Appellee,

v.

NABISCO, INC., Appellant.

No. 75–1444.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1976.

Decided June 16, 1976.

As Modified on Denial of Rehearing and
Rehearing En Banc Aug. 25, 1976.

Veryl L. Riddle, St. Louis, Mo., for appellant; R. H. McRoberts, Thomas C. Walsh and Robert F. Scoular, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., on brief.

Robert S. Allen, St. Louis, Mo., for appellee; Dominic Troiani, David W. Detjen, of Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., on brief.

Before VOGEL and VAN OOSTER-HOUT, Senior Circuit Judges, and BRIGHT, Circuit Judge.

BRIGHT, Circuit Judge.

In mid-1972, the Ralston Purina Company (Ralston) entered into a contract to sell its frozen food processing plant located in Wellston, Ohio, to Freezer Queen Foods, Inc. (Freezer Queen), a wholly-owned subsidiary of Nabisco, Inc. (Nabisco). In connection with this transaction, Nabisco presented Ralston with a guaranty letter in which it allegedly guaranteed the contract obligations of its subsidiary. Freezer Queen thereafter declined to perform the contract and Ralston brought the instant action solely against Nabisco for breach of the guaranty contract. The district court submitted the issues to the jury upon a general verdict and special interrogatories. The jury found Nabisco liable to Ralston on the guaranty contract and assessed damages in the sum of $3,333,083.30. Nabisco appeals asserting that it was entitled to a judgment of dismissal as a matter of law and alternatively contends that the district court committed prejudicial error in its instructions relating to damages.[1]

We have fully reviewed the record and reverse on the issue of contract liability.

The written documents and the essentially undisputed testimony relating to the background of the transaction disclose that in mid-1972, Ralston decided to sell its frozen food processing plant in Wellston, Ohio. This plant had been financed in substantial part through the issuance of industrial revenue bonds, which Ralston had assumed under its lease with a community improvement corporation which had constructed the facility for Ralston, and water and sewer bond obligations.[2] Corporate officers of Nabisco and Paul Snyder, the president of Freezer Queen (who also served as an officer of Nabisco) entered into preliminary negotiations with Ralston officials concern-ing the possible purchase of the plant. The parties apparently reached a tentative agreement by mid-September. On September 22, 1972, Nabisco's legal department forwarded to Ralston's attorneys an incomplete first draft of a proposed agreement for a sale transaction of these facilities to Freezer Queen, the Nabisco subsidiary.

Because of income tax ramifications, Ralston was anxious to sign a contract prior to the close of its fiscal year, September 30. Freezer Queen's president, Paul Snyder, had raised some questions relating to the transfer of supervisory personnel at the Wellston plant from Ralston to the proposed new owners, and to the transfer of the natural gas allotment which the gas distributor, Columbia Gas, had allotted to Ralston. Notwithstanding these impediments to consummation of a contract, Thomas Coleman, an attorney for Ralston, and Warren M. Shapleigh, president of Ralston, flew to New York on September 29, and at the Nabisco headquarters obtained a signed agreement for purchase of the Wellston facility by Freezer Queen. The agreement provided that Freezer Queen would pay Ralston one million dollars upon closing and would assume the obligations of the industrial revenue and water and sewer bonds totalling eight million dollars. In return, Ralston agreed to assign to Freezer Queen all of Ralston's rights, title, and interest in and to the Wellston plant. The parties agreed to a closing date as soon as practicable prior to November 30, 1972, but if not closed by that date, either party could terminate the agreement. The contract included several conditions relating to the closing of the transaction, including the following:

Article 5. *Conditions of Closing—Assignee*

The obligation of Assignee [Freezer Queen] to complete the transactions contemplated by this Agreement is subject to the satisfaction on or prior to the Closing Date of the following conditions:

1. Federal jurisdiction rests upon diversity of citizenship.

2. The industrial revenue bond obligations totalled seven million dollars, and the water and sewer bond obligations totalled one million dollars.

(a) All legal matters shall have been approved by counsel for Assignee.

\*   \*   \*   \*   \*   \*

(d) Assignee shall have been satisfied that it will be able to employ those employees of Assignor that in the judgment of Assignee's President Assignee will need to operate the plant being acquired hereunder after the Closing Date.

(e) The restoration of Assignor's allocation of natural gas from Columbia Gas of Ohio, Inc. to 50,800,000 cubic feet per year and the establishment to Assignee's satisfaction that said restored allocation will be available to Assignee on and after the Closing Date. [A: Exhibit Vol. I, E–62–63.]

Pursuant to a request from Ralston's counsel a few days prior to the September 29 signing, Nabisco prepared a guaranty letter signed by its president, Robert M. Schaeberle and addressed to Mr. Shapleigh, president of Ralston. Legal counsel for Nabisco-Freezer Queen delivered the letter to Ralston's counsel at the September 29th conference. That letter read:

This will serve to confirm our mutual understanding and agreement that as long as Freezer Queen Foods, Inc. is a wholly owned subsidiary of Nabisco, Inc., Nabisco, Inc. will guarantee the performance by Freezer Queen Foods, Inc. of its obligations arising out of the Agreement between Freezer Queen Foods, Inc. and Ralston Purina Company of even date with respect to Ralson [sic] Purina Company's Wellston, Ohio facilities.

In the event Nabisco, Inc. should decide to dispose of Freezer Queen Foods, Inc. at some future date, Nabisco, Inc. will use its best efforts to have the purchaser of Freezer Queen Foods, Inc. likewise guarantee the performance by Freezer Queen Foods, Inc. of its obligations under said Agreement. [A: Exhibit Vol. I, E–80 (Ex. 28).]

The evidence, as discussed below, indicates that Shapleigh and Coleman, Ralston's attorney, expressed disagreement with the extent of the guaranty obligation but that J. Stewart English, a vice president of Nabisco, gave some assurance that the language of the guaranty letter could be satisfactorily modified at a later time. With this assurance, Ralston's president signed the agreement for the sale of the Wellston plant and turned the guaranty letter over to Coleman. Coleman thereafter wrote on the face of the letter guaranty the phrase: "Needs to be revised."

Thereafter, in November, Freezer Queen declined to close the contract because its president, pursuant to Article 5 of the contract, quoted above, asserted that Freezer Queen had been unable to employ the necessary personnel from Ralston needed to operate the plant and that Ralston had not established to his satisfaction or the satisfaction of Freezer Queen's counsel, Walter Halliday, that the full natural gas allocation necessary for operating the plant could be restored and transferred from Ralston to Freezer Queen. Based on this alleged breach by Freezer Queen, Ralston brought this action against Nabisco alone on the letter of guaranty. In its brief appellant Nabisco asserts Ralston could not bring a legal action against Freezer Queen for breach of the underlying sales contract since that written contract provided that any controversy arising out of the contract would be settled by arbitration. As of the time of trial, Ralston had not initiated any proceedings looking toward arbitration of any dispute with Freezer Queen. Ralston subsequently sold the Wellston plant to Banquet Foods for $3,750,000 in cash, and Banquet assumed the water and sewer bond obligations but not the industrial revenue bond obligations.

The district court presented the issues tendered by the parties to the jury in the form of five interrogatories, as follows:

SPECIAL INTERROGATORIES TO BE ANSWERED
BY THE JURY

1. Did Ralston Purina accept the guarantee set forth in the letter of September 29, 1972 from Robert Schaeberle to Warren M. Shapleigh prior to entering into the contract with Freezer Queen?

      Yes x    No . . . . .

2. If so, was said letter intended by the parties (Ralston Purina and Nabisco) to guarantee that Freezer Queen would close the transaction for the acquisition of the Wellston, Ohio, frozen food plant if the conditions of the contract were met.

      Yes x    No . . . . .

3. Was Freezer Queen satisfied, in the exercise of good faith, that it would not be able to employ all of the employees of Ralston Purina that in the good faith judgment of Paul Snyder, the president of Freezer Queen, would be needed to operate the freezer plant for Freezer Queen?

      Yes . . . No  x

4. Was the allocation of 50,800,000 cubic feet to the Ralston's Wellston, Ohio, freezer plant from Columbia Gas of Ohio, Inc. restored prior to Freezer Queen's refusal to close?

      Yes x    No . . . . .

5. Did Ralston Purina establish to the good faith satisfaction of counsel for Freezer Queen that such allocation would be available to Freezer Queen on and after the closing date?

      Yes x    No . . . . .

[A:41-42.]

As noted above, the jury answered each of the five interrogatories in favor of Ralston and then by way of a general verdict awarded plaintiff damages in the sum of $3,333,083.30. In seeking reversal, Nabisco contends that the district court erred in submitting the contract issues to the jury and in refusing to grant judgment n. o. v., for the following reasons: (a) no contractual relationship existed between the parties because the undisputed evidence showed that Ralston had rejected Nabisco's guaranty letter; (b) even if the guaranty letter did create a contractual relationship between Ralston and Nabisco, it did not encompass a guarantee by Nabisco that Freezer Queen would close the underlying contract; and (c) Freezer Queen did not breach the underlying contract because neither Freezer Queen's president nor its legal counsel were satisfied that the natural gas allocation would be restored and Freezer Queen's president was not satisfied that Freezer Queen could employ the necessary Ralston supervisory personnel at the Wellston plant.

Appellee-Ralston contends that all contract issues rested on disputed matters of facts and were properly submitted to the jury and that the court's rulings and instructions relating to damages did not constitute prejudicial error.

We turn first to a consideration of whether the guaranty letter constituted a completed agreement.

I. *Guaranty Letter: Accepted or Rejected?*

A. *Factual Background.*

Appellant contends that Ralston rejected the letter of guaranty on September 29, at the signing of the underlying contract. The resolution of this contention turns on the testimony of the parties and letters exchanged between counsel for the parties.

As we have already noted, Ralston's interest in the frozen food processing plant rested in part upon a lease from the Wellston Growth Corporation, a community improvement corporation at Wellston, Ohio, which had constructed the plant for Ralston and had financed the construction through industrial revenue bonds. Payments under the lease funded the industrial revenue bonds in the principal amount of approximately seven million dollars. In addition, Ralston had obligated itself to pay certain water and sewer bonds in the sum of one million dollars. The contract provided that Ralston would assign its interest to Freezer Queen and that Freezer Queen would assume the obligations under the lease and bonds in addition to paying Ralston a certain amount of cash.

The oral negotiations led to a proposed written agreement which Halliday, the attorney for Nabisco and Freezer Queen, submitted to Coleman, attorney for Ralston. That proposal contemplated a transaction solely between Ralston and Freezer Queen. Coleman responded to that proposal in part by proposing an indemnity guaranty by Nabisco. Coleman wrote on this matter:

While I have not specifically checked this point with our management, it would probably be my recommendation that the various obligations assumed in this transaction by Freezer Queen Foods, Inc. be guaranteed by Nabisco, Inc., in a separate undertaking. I would appreciate your reaction to this proposal as soon as possible. [A: Exhibit Vol. I, E–45.]

In response to this suggestion, Nabisco's attorney, Halliday, prepared the letter of guaranty which has already been quoted, *see* p. 681 *supra*, and Nabisco's president, Schaeberle, signed this letter guaranty. Thereafter, Halliday delivered the document to Coleman, Ralston's attorney, at the September 29th conference at Nabisco headquarters in New York City.

Upon reading the guaranty letter, Coleman informed Halliday that he wanted the guaranty letter changed from "wholly-owned subsidiary of Nabisco, Inc." to "subsidiary of Nabisco, whether wholly-owned or partially owed." Halliday agreed to the change and Coleman informed Shapleigh of the change. Nevertheless, when Shapleigh first read the guaranty letter on the afternoon of September 29, he expressed dissatisfaction with its terms. Shapleigh testified that he voiced objections to the language of the guaranty which provided that if Nabisco should dispose of Freezer Queen, that Nabisco would use its "best efforts" to obtain a similar guarantee from the purchaser of Freezer Queen. Shapleigh testified that he told Ralston's attorney, Coleman, that he considered the guaranty as "totally unacceptable." [3] [A:129.]

After also voicing similar objections to Stewart English, Nabisco's vice president of corporate development, who was conducting negotiations on behalf of Nabisco, Shapleigh testified that English responded by saying "[t]his is no problem, we'll get it corrected." [A:92.] English essentially confirmed this conversation. On further questioning, Shapleigh responded as follows:

Q. Did you remove this condition that you were questioning? A. Yes.

Q. And then what did you do?

A. I signed the contract. [A:92.]

In sum, the testimony, without any real dispute, discloses that Nabisco presented Ralston's president, Shapleigh, with a form of a guaranty. When Shapleigh objected to the "best efforts" part of the second paragraph, Nabisco's representative, English, indicated that the matter would be satisfactorily resolved. Ralston's president, Shapleigh, then signed the contract selling the Wellston facility to Freezer Queen. He turned the letter guaranty over to Ralston's attorney, Coleman. Coleman endorsed on the letter, "Needs to be revised." Later that same day after the contract had been signed, and contemporaneously with continuing discussions relating to closing of the contract, Nabisco and Freezer Queen's attorney, Halliday, gave Ralston's attorney, Coleman, a letter interpreting the term "wholly-owned subsidiary" in the guaranty to mean "subsidiary of Nabisco, Inc., whether wholly-owned or partially owned." [A: Exhibit Vol. I, E–68.]

Nabisco, in contending that Ralston never accepted the guaranty letter emphasizes (a) Shapleigh's verbal objections to the substance of the guaranty letter; (b) Coleman's phrase "Needs to be revised" written on the face of the guaranty; and (c) requests for a new guaranty by Ralston in

**3.** At another point, in response to questioning by Ralston's attorney, Shapleigh testified as follows:

Q. What were you questioning? A. I said, "Tom [Coleman], I don't think this is enough. This is not my understanding of the guarantee that we have been talking about. Throughout this whole negotiation we had been dealing I thought with Nabisco and this is not an unconditional Nabisco guarantee."

Q. What was the condition that you were questioning? A. Well, in the event that Nabisco should dispose of Freezer Queen Foods, why, they said they will just use their best efforts to take care of us.

Q. And why was this a concern of yours? A. Well, we would—had no idea of what the future of Freezer Queen might be and thought all of the discussions that I had had and all the contacts that our top management had had we had been dealing with Nabisco and not with Freezer Queen. [A:91–92.]

subsequent correspondence.[4] Ralston contends that it accepted the Nabisco guaranty to the extent of the obligations contained therein upon receiving verbal assurances from Nabisco that it would later modify the guaranty and that Ralston evidenced its acceptance by executing the contract of assignment of the Wellston plant to Freezer Queen and by retaining the then-existing guaranty letter.

## B. *The Applicable Law.*

■ An offer to guarantee the performance of another usually proposes a unilateral contract and the performance of the act requested furnishes consideration for the offeror's promises and is also an overt manifestation of assent. 1 Williston on Contracts, §§ 68–69; Restatement of Contracts, § 56. While the law is in much confusion as to whether notice of performance is necessary in order to bind the guarantor, *see* Williston, *supra*, §§ 69(A)–(AA), we are not here concerned with notice, for the parties' manifestations took place in the presence of each other.

■ Contracts of guaranty often relate to a promise by the guarantor (offeror) to underwrite or guarantee the payment of another's debt or obligation to a creditor (offeree). The courts have recognized that an offeree who may act upon the guarantor's promise does not, by operation of law, necessarily repudiate or establish nonreliance upon the guaranty offer by requesting the execution of a new guaranty with some-

what different terms. *See Union Carbide Corp. v. Katz,* 489 F.2d 1374 (7th Cir. 1973).[5]

Nabisco cites *Lester Piano Co. v. Romney,* 41 Utah 436, 126 P. 325 (1912), and *Juliana, Inc. v. Salzman,* 181 So.2d 3 (Fla.App.1965), as support for its position that Ralston rejected or repudiated the proposed guaranty. In *Lester Piano,* the plaintiff sought a conditional guaranty from an officer of the defendant-debtor. The creditor rejected the proposed guaranty and forwarded another form to the guarantor. But, the record shows that the creditor had been extending credit to the debtor-company before receiving any guaranty and continued to do so after rejecting the unsatisfactory guaranty. No credit was ever extended in reliance upon that unsatisfactory guaranty. The court found no binding guaranty. Similarly, in *Juliana,* the record shows that the offeree rejected a proposed guaranty and did not rely upon it in entering into contract arrangements which were different than those initially contemplated between the plaintiff-creditor and a third party-debtor. Thus, these two cases are inapposite.

Factual circumstances here are substantially different than those encountered in any of the cases cited by the parties. The contract executed between the principals, Ralston and Freezer Queen, remained open-ended, or not final. Under the contract Freezer Queen reserved the privilege of declining to close the agreement if its president was not satisfied with arrangements for employment of Ralston's supervisory

---

4. On October 3, 1972, attorney Coleman wrote attorney Halliday:

    As we have indicated, the written commitment by Mr. Robert M. Schaeberle, dated September 29, 1972, as to Nabisco's obligations to Purina does not represent the extent of Nabisco's commitment to Purina under which this transaction was contemplated. I shall be happy to propose a new draft of this statement if you so desire. [A: Exhibit Vol. I, E–93.]

    On November 8, 1972, Coleman wrote Thomas McDonnell, another Nabisco attorney, concerning closing of the sale and advised in part:

    We shall of course expect to receive at that [closing] time a revised letter agreement to replace the one from Nabisco's Robert M.

Schaeberle to our Warren M. Shapleigh, dated September 29, 1972. This matter has been discussed with Walter Halliday and we are in agreement, in principal, to the changes he has or will recommend to Nabisco's management, as stated in our telephone conversation of October 26. [A: Exhibit Vol. II, E–278.]

5. *See also Essex International, Inc. v. Clamage,* 440 F.2d 547 (7th Cir. 1971); *Coal & Iron Nat. Bank v. Suzuki,* 3 F.2d 764 (2d Cir. 1924); *Cinerama, Inc. v. Sweet Music, S. A.,* 355 F.Supp. 1113 (S.D.N.Y.1972); *American Woolen Co. v. Moskowitz,* 159 A.D. 382, 144 N.Y.S. 532 (1913).

personnel at the Wellston plant or if its president or legal counsel was not satisfied that the natural gas allocation would become available to Freezer Queen after the closing date of the transaction. Ralston, of course, expected a new guaranty letter prior to closing.

President Shapleigh of Ralston never explicitly communicated a rejection of the guaranty to any Nabisco representative. In referring to the "best efforts" provision of the second paragraph of the guaranty letter, Shapleigh of Ralston testified as follows:

"In the event Nabisco should decide to dispose of Freezer Queen Foods, Inc. at some future date." That did not satisfy me. I turned to Mr. English and said that this was not my understanding of what—the kind of guarantee, that the condition was not acceptable. And he said, "No problem, we'll get that changed. This is definitely a Nabisco deal." [A:176.]

Nabisco's Stewart English testified of overhearing conversation between Ralston's Coleman and president Shapleigh which English understood as an "objection to the guaranty because of terms relating to Freezer Queen as a wholly-owned subsidiary of Nabisco," since Nabisco might avoid liability by selling off a few of its shares in Freezer Queen.

Attorney Halliday of Nabisco testified that he did not hear Shapleigh [Ralston's president] say anything regarding the guaranty agreement but recalled that Coleman had earlier questioned the "wholly-owned" phrase in the guaranty.

As has been noted, Halliday met this objection by preparing a second letter defining "wholly-owned subsidiary of Nabisco, Inc." to mean a subsidiary, wholly-owned or partly owned. Ralston's attorney, Coleman, retained the guaranty letter and the subsequent interpretation prepared by Halliday.

■ Under the evidence in this case, the jury was entitled to accept the version of the transaction submitted by Nabisco's own witnesses. Under that version no rejection occurred but Nabisco was bound by the guaranty letter, modified by the interpretative letter issued by its attorney, Halliday. Moreover, Ralston's efforts to obtain further modification of the indemnity guaranty falls within the contract rule illustrated in *Union Carbide Corp. v. Katz, supra*, 489 F.2d at 1377, that the request for a new guaranty with modified terms does not necessarily invalidate the offer of the guaranty previously received and acted upon by the offeree. Thus, on this record, we reject appellant's contention attacking the binding effect of the guaranty agreement.

## II. *Whether the Guaranty Letter Extended to Freezer Queen's Obligation to Close the Contract.*

Ralston contends that the language of the guaranty letter, that Nabisco would guarantee "the performance by Freezer Queen Foods, Inc. of its obligations arising out of the agreement" extended to every obligation in the underlying agreement, including Freezer Queen's obligation to close the transaction. Nabisco contends that it guaranteed only Freezer Queen's assumption of the existing lease of the premises, which supported the industrial revenue bonds in the approximate amount of seven million dollars and guaranteed the payment of an additional one million dollars in water and sewer bond obligations.

We examine this question from the four corners of the guaranty contract and, alternatively, consider all of the surrounding circumstances and relevant testimony. We conclude that Nabisco's guaranty promise was circumscribed and did not cover Freezer Queen's obligation to close the contract.

### A. *The Agreement Terms Covered Obligations After the Closing of the Contract.*

■ We are presented with the question of the construction of the terms "obligations arising out of the Agreement" and "obligations under said Agreement" as used

in the two-paragraph letter guaranty, which we requote:

This will serve to confirm our mutual understanding and agreement that as long as Freezer Queen Foods, Inc. is a wholly owned subsidiary of Nabisco, Inc., Nabisco, Inc. will guarantee the performance by Freezer Queen Foods, Inc. of its obligations arising out of the Agreement between Freezer Queen Foods, Inc. and Ralston Purina Company of even date with respect to Ralson [sic] Purina Company's Wellston, Ohio facilities.

In the event Nabisco, Inc. should decide to dispose of Freezer Queen Foods, Inc. at some future date, Nabisco, Inc. will use its best efforts to have the purchaser of Freezer Queen Foods, Inc. likewise guarantee the performance by Freezer Queen Foods, Inc. of its obligations under said Agreement. [A: Exhibit Vol. I, E–80.]

The first paragraph relates to the then-existing situation, i. e., the guaranty of Freezer Queen in its status as a wholly-owned subsidiary and promises to guarantee Freezer Queen's performance of its "obligations arising out of the Agreement." In virtually identical language the phrase is reiterated in the second paragraph. But there the context is quite different, speaking clearly of a time when Nabisco might dispose of Freezer Queen. Such disposition would necessarily occur in the future when Nabisco "will use its best efforts to have the purchaser of Freezer Queen Foods, Inc. *likewise* guarantee the *performance* by Freezer Queen Foods, Inc. *of its obligations* under said Agreement." (Emphasis added).

While the duty to close by Freezer Queen may represent an obligation arising out of, incident to, or under said agreement, the duty to close would in no way extend to some future purchaser of Nabisco's interest in Freezer Queen. Thus, the performance of "its [Freezer Queen's] obligations arising out of the Agreement" (first paragraph) or "its [Freezer Queen's] obligations under said Agreement" (second paragraph) implies commitments relating to long-term obligations extending beyond the closing of the contract.

## B. *The Relevant Evidence Supports a Limited Construction of the Term "Obligations."*

If we consider the questioned language to be ambiguous, the relevant testimony and surrounding circumstances supports unequivocally Nabisco's view that the term "obligations," referred only to Freezer Queen's duty to assume the bond and lease obligations and did not contemplate a guaranty of Freezer Queen's closing of the contract.

Although Ralston and top Nabisco officials had engaged in generally preliminary negotiations for several weeks, it became clear by September 25, that Freezer Queen, not Nabisco, would purchase the Wellston facility.

In the cover letter of the first incomplete draft of the underlying agreement, Nabisco's attorney, Halliday, wrote to attorney Coleman that:

Article 3, when complete, will set forth the purchase price, the assumption of Ralston's obligations by Freezer Queen with respect to the various leases and agreements that are to be assigned, and the indemnity by Freezer Queen of Ralston with respect to any liability that might arise under the warranties given by Ralston as a result of Freezer Queen's failure to pay the amounts required by the lease with the Agency and the water service and sewer service agreements with the City of Wellston. [A: Exhibit Vol. I, E–23.]

Thus, "obligations" assumed by Freezer Queen were represented as an item separate from the purchase price. Coleman, in response to Halliday's draft contract, prepared and submitted proposals for the assignment and indemnification agreement covering Ralston's obligations under the water-sewer agreement, etc., and "Assignment and Assumption Agreement" covering the lease between Ralston and the Wellston Growth Corporation. That letter contained the paragraph previously quoted in part I of this opinion. *See* p. 683 *supra*. The

full text of the letter is reproduced in the margin.[6]

In the context of this exchange of correspondence, the term "obligations assumed in this transaction" relates to Ralston's obligations for lease payments for retirement of industrial revenue bonds and obligations under water and sewer bonds which Freezer Queen would assume and which Ralston would guarantee.

None of Ralston's witnesses testified that Ralston understood that the guaranty in question included an obligation of Nabisco to guarantee Freezer Queen's closing of the transaction. President Shapleigh of Ralston testified that he wanted the guaranty to relieve Ralston of its obligations at Wellston including the water and sewer bonds, the lease, the general revenue bonds, and taxes. [A:131, 134–35.] Attorney Coleman, who assumed the duty on behalf of Ralston of reducing the general terms of the negotiations into a specific legal contract, outlined the specific obligations only. His testimony corroborated the intent reflected in his correspondence.

Q. [Counsel for Nabisco] Now, did you understand that Freezer Queen, Inc., was to assume certain obligations that Ralston had down in Wellston, Ohio? A. [Coleman] Yes.

Q. And would you tell His Honor and the Jury what those obligations were? A. Well, they consisted basically of four obligations. There was a seven million dollar industrial revenue bond issue. There was a water supply bond agreement and a sewer supply agreement bond. Then there was a small supplemental water agreement. There are four—basically four sets of obligations that I was aware of.

Q. Lease? A. Then there was a lease from the Wellston Growth Corporation into the Ralston Purina Company.

\* \* \* \* \* \*

Q. And you understood then that the seven million dollars in revenue bonds and the approximately million dollars in water and sewer bonds would be assumed by Freezer Queen? A. Yes. [A:434–35.]

Coleman added that in his discussion with Nabisco's attorney, Halliday, on September 29, he understood that there would be a guaranty from Nabisco that they would stand behind the obligations assumed by Freezer Queen. He termed those obligations as those "down in Wellston" and add-

---

6.
September 25, 1972

Mr. Walter S. Halliday, Jr.
General Counsel
National Biscuit Company
425 Park Avenue
New York, New York 10022
Re: *Wellston Property*
Dear Walt:
This is to acknowledge receipt of a copy of your proposed general Agreement with respect to our Wellston, Ohio, facilities.
For your review, comments and suggestions, I enclose a hurried proposed draft of an Assignment and Indemnification Agreement covering our obligations under the Water Service Agreement, etc. We would envisage a similar format for the Sewerage Service Agreement, etc.
Likewise, I also enclose proposed drafts of a simple "Assignment and Assumption Agreement", covering the lease between Purina and the Wellston Growth Corporation and a "Certificate Concerning Leased Equipment" which we propose to send to the City of Wellston, the Wellston Growth Corporation and the Third National Bank in Nashville, Trustee, for their approval.

While I have not specifically checked this point with our management, it would probably be my recommendation that the various obligations assumed in this transaction by Freezer Queen Foods, Inc. be guaranteed by Nabisco, Inc., in a separate undertaking. I would appreciate your reaction to this proposal as soon as possible. I have no pride of authorship in the foregoing enclosures and trust that they will be regarded as preliminary suggestions for further discussion, additions, etc.
Yours very truly,
/s/ Tom
Thomas C. Coleman
Counsel
Consumer Products Group
[Ralston Purina Company]

TCC: kjk
cc: Mr. D.R. Seibel, 3T
Checkerboard Square
St. Louis, Missouri
63183
[A: Exhibit Vol. I, E–45.]

ed that "if Freezer Queen Foods would not remain a subsidiary, they [Nabisco] would use their best efforts to try to find—to persuade the next purchaser of the plant to assume these obligations." [A:441.]

In presenting its case, Nabisco recalled Coleman as an adverse witness. Coleman admitted that he never asked Nabisco to guarantee Freezer Queen's closing nor did he even have such a contingency in mind. The testimony proceeded as follows:

Q. Mr. Coleman, in all of these conversations and all of this correspondence did you ever request that Nabisco guarantee that Freezer Queen would close on the date set forth for closing in that contract? *Did you ever ask that the guarantee include a guarantee that Freezer Queen would close the contract?* A. *I never asked that question.*

Q. No, sir. *You never had that in mind, did you?* A. *No. I didn't.* [A:1299 (emphasis added).]

Then, Nabisco's counsel asked the following question:

Q. The only thing that you ever had in mind with respect to the guarantee was that Nabisco would guarantee to pay off those obligations that Freezer Queen assumed in the contract on the date of closing that were remaining down in Wellston, Ohio. You wanted that to be stood behind by Nabisco, did you not? [A:1299.]

After some equivocation and a comment by the trial judge that the witness had not answered the specific question, Coleman responded:

Well, that was certainly one of the things I was thinking about and wanting during that period. [A:1300.]

Coleman further conceded that he would have drafted the guaranty in the same manner as written by Halliday except "without any conditions as to wholly-owned or otherwise." [7] [A:1300.]

Finally, we observe that Freezer Queen reserved the right not to close the contract unless it could, to its satisfaction, obtain Ralston's supervisory employees needed to operate the Wellston plant and obtain the full natural gas allocation from Columbia Gas Company. Only a strained and unusual construction of the contract would apply the guaranty to the obligations of Freezer Queen to close the contract which remained indefinite as of September 29, 1972.

Ralston relies on some general statements of Nabisco's president, Schaeberle, given in a deposition and read into the trial record, as support for its proposition that Nabisco's guaranty-letter guaranteed Freezer Queen's closing. When Schaeberle was asked where the consideration to buy the plant was going to come from, he said:

A. It was going—I have to plead ignorance as to how much was in cash and how that was all going to be worked out. I'm not at all certain, but it was a contract between one of our wholly-owned subsidiaries, Freezer Queen.

Q. And Nabisco was standing behind it on the guarantee—

A. On the guarantee of the performance that on this contract that was carried by Freezer Queen, that we would stand behind Freezer Queen. [A:347.]

This statement at best is equivocal. Moreover, it must be construed in the context of the resolution of the Nabisco Board of Directors granting its officers authority to execute a guaranty "of the performance

---

7. Coleman also testified as to a conversation he had with president Shapleigh on September 29, concerning the guaranty:

Q. And what, if anything, did he [Mr. Shapleigh, Ralston's president] say to you with respect to Exhibit 28? A. As we were walking toward the library he said well, that even with that change this wasn't the guarantee that the parties were contemplating and I was mortified I think is the best way because I said, you know, "Why isn't it?

Why isn't it exactly what we had?" He said, "It's not broad enough. It's not an unconditional guarantee which I understand we are going to get from Nabisco."

In other words, *regardless of what happens to Freezer Queen Nabisco would stand behind or assume Ralston's payment under these bonds* and it was kind of at that point that we were then right up in the same room with Mr. English and Mr. Halliday. [A:405 (emphasis added).]

by Freezer Queen Foods, Inc. *of its obligations under said lease and related water service and sewer service agreements."* [A: Exhibit Vol. I, E–75 (emphasis added).]

The letter guaranty and the critical language therein read within its four corners does not evidence Nabisco's intent to guarantee Freezer Queen's closing. Furthermore, the correspondence and trial testimony of Ralston's attorney, Coleman, demonstrates that Ralston sought a guaranty relating only to the revenue bonds, sewer and water bonds, and lease obligations. Finally, Nabisco's corporate resolution authorized a guaranty only of long-term obligations of the lease which would retire the revenue bonds and water and sewer bonds. We find no basis in the record to impose upon Nabisco a guaranty of any obligations other than those long-term obligations referred to in precontract correspondence and documents. The obligations referred to in the letter agreement thus did not include the obligation to guarantee that Freezer Queen would close the underlying contract. Accordingly, the trial court erred in refusing to direct a verdict for appellant and in denying judgment n. o. v.

III. *Disposition of Other Issues.*

Since Nabisco did not underwrite or guarantee Freezer Queen's obligation to close the contract, the determination of the jury that Ralston Purina established good faith satisfaction of Freezer Queen as to the employee and gas issues, and its determination that gas allocation had, in fact, been restored, become immaterial and we do not address those issues.

**8.** The adjudication in district court is not a complete nullity, however, for the jury properly determined that Ralston Purina "accepted" the guarantee. We have, in accordance with this opinion, determined the guaranty to be limited in scope. That part of the jury verdict determining that Ralston accepted the guaranty should be incorporated into a modified judgment and be given such effect, if any, as may be appropriate should Ralston seek arbitration and obtain an arbitration award against Freezer Queen for the latter's alleged breach of contract.

Accordingly, we reverse and remand this case to the district court for the entry of an appropriate modified judgment and for vacation of the award of damages. Appellant is entitled to 50 percent of its costs on this appeal.[8]

VAN OOSTERHOUT, Senior Circuit Judge (dissenting):

I respectfully dissent. Plaintiff's pleaded cause of action is based exclusively on the letter guaranty set out in the majority opinion.[9]

We do not have before us a situation where the person tendered the guaranty acted in reliance upon it without comment. In our case, Ralston flatly rejected the guaranty as written and as supplemented by the interpretation agreement, which clarified paragraph one but did not meet Nabisco's objections. The evidence is conclusive that there was no meeting of minds on the letter agreement or any other written guaranty. Nabisco was specifically advised that Ralston found the letter agreement unacceptable and wrote thereon "needs to be revised."

There is no substantial evidence to support a finding that Ralston accepted the guaranty pleaded.[10]

The threshold determination that no valid guaranty has been established makes it unnecessary to consider other issues raised and answered by the majority and I express no view thereon.

Nabisco has challenged the sufficiency of the evidence to support the judgment by timely motions for directed verdict and judgment n. o. v. I would reverse and

**9.** The issue of an oral guaranty and its effectiveness in light of the Statute of Frauds is not before us.

**10.** Why Ralston signed the purchase contract without a guaranty is immaterial to the issues here. The evidence reflects that Ralston for tax purposes was in a hurry to complete the sale and may well have relied on Nabisco's representation that a mutually satisfactory guaranty agreement could be worked out.

remand with directions to dismiss the complaint.