872 F.2d 539
 8 UCC Rep.Serv.2d 427
 WARNACO, INC., Plaintiff-Appellee,
v.
Harold FARKAS, Wake Warthen, and Morton S. Robson,
Defendants-Appellants.
Harold FARKAS, Cross-Claimant-Appellee,
v.
Morton S. ROBSON, Cross-Claim-Defendant-Appellant.
 Docket 88-7878, No. 778.
 United States Court of Appeals,
Second Circuit.
 Submitted Feb. 7, 1989.
Decided April 14, 1989.
 
 Howard Rhine, Coleman & Rhine, New York City, for plaintiff-appellee.
 Morton S. Robson, Robson & Miller, New York City, for defendants-appellants Robson and Warthen.
 Harold Farkas, North Woodmere, N.Y., pro se.
 Before KEARSE, PIERCE and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal from a grant of partial summary judgment and final judgment after a bench trial before Judge Carter. The summary judgment allowed appellee Warnaco, Inc. to recover the full amount of a guarantee executed by appellants Harold Farkas, Wake Warthen and Morton S. Robson as part of their purchase of a clothing design business. Judge Carter rejected appellants' claims that the language of the guarantee was ambiguous and that appellee had accepted certain trademarks as collateral in full satisfaction of the debt under Article 9 of the Uniform Commercial Code ("U.C.C."), Conn.Gen.Stat. Secs. 42a-9-101 et seq. (1988); Warnaco, Inc. v. Farkas, 664 F.Supp. 738 (S.D.N.Y.1987). The appeal from judgment after trial involves a cross-claim by Farkas against Robson based on an indemnification agreement between them. Judge Carter rejected Robson's affirmative defense of economic duress but failed to reach the defense of fraudulent misrepresentation. We affirm in part the grant of summary judgment on the grounds that the guarantee is not ambiguous and that the trademarks were not accepted in full satisfaction of the debt. We remand, however, for findings concerning a possible disposition of the trademarks and for a determination of their value. On the cross-claim, we affirm the rejection of the defense of economic duress. We remand, however, for a decision regarding the defense of fraudulent misrepresentation.
 
 BACKGROUND
 
 2
 This dispute arose out of the sale by Warnaco of certain trademarks and of two corporations, Jerry Silverman, Inc., and Jerry Silverman Sport, Inc. (collectively "JSI"), that were in the clothing design business. Farkas, Robson and Warthen formed a corporation named Farowa to purchase JSI from Warnaco in 1981. Farkas, a long-time officer of JSI, took fifty percent of the shares while Robson and Warthen each took twenty-five percent. A stock purchase agreement recited that Warnaco "wishes to sell ... all of the shares of the Common Stock of Jerry Silverman ... and the Trademarks [of Jerry Silverman]." The sale, however, was conditional upon full payment of the purchase price. The stock purchase agreement thus stated that Warnaco conveyed to Farowa a licensing agreement "to use the Trademarks without payment of royalties," adding that "[a]t such time as the note is paid in full ... SELLER shall sell, transfer and assign the licensed Trademarks to Purchaser." The parties agree that the transfer was to be for the nominal consideration of one dollar.
 
 
 3
 Farowa made a cash payment of $750,000 to Warnaco and executed a promissory note for an additional $750,000. The note stipulated six yearly payments of $50,000 and a final principal payment of $450,000, along with quarterly interest payments during its term. In the event of default, the note provided for acceleration and an increased rate of interest. Farkas, Robson and Warthen annexed to the note a personal guarantee, pledging "due and punctual" payment and jointly and severally guaranteeing "twenty percent (20%) of the amount due under this Note." Warnaco and Farowa also entered into a separate agreement that licensed Farowa to use the JSI trademarks. This agreement provided that the license could be terminated upon a default under the promissory note.
 
 
 4
 Robson and Warthen were principally financial backers of JSI, while Farkas managed day-to-day operations. JSI did not prosper, and Warnaco and Farowa executed a subsequent agreement, of no significance for this appeal, extending the time for payment. JSI's financial condition continued to deteriorate, however, and in September 1983 Robson informed Farkas that he, Robson, would no longer provide financing unless he could exercise control of the company and could bring in new management. In response, Farkas executed a revocable proxy agreement, authorizing Robson to vote Farkas's shares in JSI. Discussions were then commenced among Farkas, Robson and one Princess Katalin zu Windisch-Graetz ("Princess Katalin"), a designer of evening gowns, about Princess Katalin's assuming the day-to-day management of the business while Farkas continued to be responsible for financial matters. By November 5, 1983, a draft agreement designed to implement that arrangement had been prepared. Two days later, however, Farkas revoked his proxy. Nevertheless, preparation for the change in management continued, with Princess Katalin moving sample designs of her evening-wear line into the JSI showroom in December.
 
 
 5
 What happened next is a matter of factual dispute between the parties. According to Robson, Princess Katalin reported for work on the first business day of 1984, but was refused admittance. Robson then confronted Farkas, who demanded that Robson buy Farkas's stock and indemnify Farkas against any personal liability. On January 6, 1984, Robson agreed to purchase Farkas's interest and entered into an agreement to indemnify Farkas against personal liability on the guarantee of the promissory note. Robson claims that he entered into this purchase and indemnification agreement in reliance on an allegedly inaccurate cash flow projection provided by Farkas. Farkas disputes Robson's account.
 
 
 6
 Robson and Princess Katalin were unable to restore JSI to financial health, and Farowa defaulted on its payments to Warnaco. In response, Warnaco terminated the trademark licensing agreement. Sometime before Warnaco had notified Farowa of the termination of the licensing agreement, however, Robson attempted to license the trademarks to an entity called "Deborah for Kenneth Green, Inc." ("DKG"). After receiving Warnaco's termination notice, Robson put DKG in touch with Warnaco, and the two companies negotiated a new license agreement. Robson claims the value of the trademarks is substantially greater than the amount due under the note. Warnaco claims that it never received any payments under its agreement with DKG, which has since been terminated.
 
 
 7
 Warnaco subsequently filed this diversity action in the Southern District of New York to recover on the guarantee of the promissory note by Farkas, Robson and Warthen. Farkas filed a cross-claim against Robson to recover on the indemnification agreement. Judge Carter dealt with the matter in two stages. In his first decision, Warnaco, Inc. v. Farkas, 664 F.Supp. 738 (S.D.N.Y.1987), he granted summary judgment to Warnaco on the full amount of the guarantee. In doing so, he rejected appellants' claim that the guarantee was ambiguous. Id. at 741. He also rejected a defense based on Article 9 of the U.C.C., Conn.Gen.Stat. Secs. 42a-9-101 et seq. That defense asserted that the stock purchase and licensing agreements constituted a security arrangement subject to Article 9 of the U.C.C., under which the trademarks were collateral securing the purchase price of JSI. Appellants argued that Warnaco elected to accept the collateral in full satisfaction of the debt under Section 9-505. Judge Carter held that because Section 9-505 requires written notice to the debtor of the creditor's acceptance of the collateral, the failure of Warnaco to give such notice meant that there had been no acceptance. He did not, however, hold a hearing concerning the licensing agreement with DKG on the value of the trademarks. Instead, he entered judgment for the full amount of the guarantee.
 
 
 8
 Because Farkas's cross-claim raised material issues of fact, a trial was held. After hearing the evidence, Judge Carter held that Robson's defense of economic duress failed. Although he entered a final judgment for Farkas, Judge Carter did not address Robson's fraudulent misrepresentation defense.
 
 DISCUSSION
 
 9
 We begin with appellants' challenges to Warnaco's recovery on the guarantee. Appellants claim first that the guarantee is ambiguous as to the amount guaranteed. The pertinent language reads:
 
 
 10
 The liability of the undersigned Guarantors is limited to twenty percent (20%) of the amount due under this Note.
 
 
 11
 Appellants claim that the phrase "20% of the amount due" is susceptible to two interpretations: (i) twenty percent of the total obligation under the note, or $150,000, to be reduced only when a lesser amount is owed; or (ii) the first $150,000 to be paid under the note, reduced by whatever payments are made prior to default. They argue that the latter reading is the correct one, and that their present obligation under the guarantee is accordingly limited to $10,000, some $140,000 having been paid before default. In support of this contention, appellants proffer a written proposal prepared by them in the course of negotiations that limited their obligations to ten percent of the "outstanding balance of the Note." They claim that, because the guarantee as executed varies the language of this proposal, the phrase "amount due under the Note" must be interpreted differently from the phrase "outstanding balance of the Note," and must mean twenty percent of $750,000, or $150,000, reduced by payments made.
 
 
 12
 We reject this highly strained argument. The terms of the note require that it be "construed in accordance with the laws of the State of Connecticut." Under Connecticut law extrinsic evidence is not admissible to contradict the unambiguous terms of a writing embodying the parties' final agreement. Conn.Gen.Stat. Sec. 42a-2-202 (1988); cf., e.g., Fairfield Lease Corp. v. Eastern Sportswear Co., 6 Conn.Cir.Ct. 347, 273 A.2d 300, 302 (1970). We find the language of the guarantee to be unambiguous. Parties desiring to limit liability under a guarantee to the unpaid portion of the first twenty percent would not use the words "20% of the amount due under this Note," to express that intent. Such language is clearly a guarantee of a percentage of the total amount. Faced with this unambiguous language, we are foreclosed under Connecticut law from considering the extrinsic evidence offered by appellants. Moreover, the evidence proffered in no way aids appellants' argument. The parties' rejection of "outstanding balance" and use of "amount due" indicates an intent to increase rather than to decrease the exposure of the guarantors. Appellants are therefore liable under the guarantee.
 
 
 13
 The amount for which they are liable, however, cannot be determined on a motion for summary judgment. In the district court, the parties stipulated for purposes of the summary judgment motion that the trademarks were collateral to secure the debt. This stipulation was superfluous because the agreements in question created a security interest as a matter of law under the Connecticut U.C.C. "Regardless of what name the parties give to a transaction, the courts, in general, look beyond the form to the substance, and when one who is called a[n equipment] lessee may become the owner of the leased property at the end of a lease term on full payment of the stipulated rent or by the payment of a small additional amount, the transaction is generally held to be a conditional sale, even though it is couched in the terms of a lease." Tishman Equipment Leasing, Inc. v. Levin, 152 Conn. 23, 28, 202 A.2d 504, 507 (1964). See also Conn.Gen.Stat. Sec. 42a-1-201(37) (1988).
 
 
 14
 The present case involves the sale of a company's inventory and trademarks effected by a stock purchase agreement, a promissory note and a trademark licensing agreement. The buyer was allowed use of the trademarks without the payment of royalties. When the amounts due under the note were fully paid, the trademarks were to be transferred for one dollar. Looking at substance rather than form, it is clear that retention by the seller of title to the trademarks, which were obviously vital to the conduct of JSI as a business, pending satisfaction of the obligations of the note for the purchase price, constituted a conditional sale under Connecticut law. A license of trademarks is for present purposes functionally indistinguishable from a lease of equipment where title is to pass for nominal consideration upon satisfaction of the debt incurred as part of a purchase of the trademarks or equipment. The trademarks were therefore collateral as a matter of law.
 
 
 15
 Appellants claim that Warnaco's termination of the licensing agreement was a repossession of collateral that constituted an acceptance in full satisfaction of the underlying debt under U.C.C. Sec. 9-505. They also claim, apparently in the alternative, that Warnaco disposed of the trademarks by licensing them to DKG without providing the requisite written notice.
 
 
 16
 Under the U.C.C., a secured party in possession of collateral has a number of options. Pursuant to Section 9-504, the party may, after notice to the debtor, dispose of the collateral in a "commercially reasonable" fashion, either turning any surplus over to the debtor or pursuing the debtor for any deficiency after the sale.[1] Alternatively, the secured party may agree to accept the collateral in satisfaction of the debt under Section 9-505, the U.C.C. equivalent of common-law accord and satisfaction. If the secured party elects to accept the collateral in full satisfaction, notice of the election must be given to the debtor in writing.[2] If the secured party does not accept the collateral in satisfaction of the debt, it retains its remedies under Section 9-501,[3] and those remedies are cumulative. See, e.g., Chittenden Trust Co. v. Marshall, 146 Vt. 543, 507 A.2d 965, 968-69, 42 U.C.C. 1791 (1986).
 
 
 17
 The secured party may not of course collect more than the outstanding debt. If the secured party holds the collateral without either making a commercially reasonable sale or notifying the debtor of his intention to accept it in satisfaction of the debt, the debtor may move the court under Section 9-507 for an order that the secured party make some disposition of the collateral.[4] Cf., e.g., S.M. Flickinger Co., Inc. v. 18 Genesee Corp., 71 A.D.2d 382, 386, 423 N.Y.S.2d 73, 76, 27 U.C.C. 1232 (App.Div. 4th Dep't 1979) ("If the secured party fails to comply with the provisions of Article 9, the debtor may protect his rights by the remedies available pursuant to Section 9-507. He may restrain or compel disposition of the collateral, or if disposition has already occurred, he may charge the creditor with any loss occasioned by its unauthorized conduct.").
 
 
 18
 We turn first to the argument that Warnaco has accepted the collateral in full satisfaction of the debt. We hold that it did not. Warnaco never gave appellants notice of such acceptance as required by Section 9-505, and appellants did not move the court for relief under Section 9-507. Some courts have, however, deemed a creditor to have accepted collateral in full satisfaction absent either written notice to the debtors or a motion under Section 9-507. These cases involved situations where the creditor has held the collateral for an inordinately long time, the collateral has been of a kind that might reasonably be expected to be used by the creditor during that time, or the collateral would predictably lose value over time. See, e.g., Millican v. Turner, 503 So.2d 289, 3 U.C.C.2d 887 (Miss.1987) (secured party held to have accepted collateral if he held automobile for inordinately long period).
 
 
 19
 We believe that these decisions depart from the scheme of the U.C.C. regarding repossessions of collateral and predict that Connecticut would not follow them. If, after repossession of collateral, a creditor does nothing, it may be compelled by the debtor to make some disposition under Section 9-507. Even if a debtor does not seek such an order, however, the creditor must deduct the value of the collateral at the time of repossession from the outstanding balance of the debt. In that scheme, there is no role for an extra-statutory rule that contemplates repossession of collateral in full satisfaction of the debt where the creditor fails to give the requisite notice and the value of repossessed collateral is less than the debt. Such a rule is not needed to protect debtors because the value of the collateral must be deducted from the outstanding balance whether or not the creditor acts to dispose of the collateral. We therefore predict that Connecticut would not hold that Warnaco accepted the collateral in satisfaction of the debt.
 
 
 20
 Nevertheless, summary judgment was not appropriate as to the amount owed under the guarantee because material facts are in dispute regarding appellants' claim that Warnaco has disposed of the collateral and regarding the value of that collateral. Appellants contend that Warnaco, by entering into the DKG licensing agreement that was the equivalent of a conditional sale, disposed of the collateral without having provided notice. If this contention is correct, Warnaco is subject to being "ordered or restrained on appropriate terms and conditions." Conn.Gen.Stat. Sec. 42a-9-507 (1988). While authority varies widely concerning the "appropriate" measures to be taken with regard to a misbehaving creditor, see J. White & R. Summers, Uniform Commercial Code Sec. 26-15 (2d ed. 1980), Connecticut courts have generally aligned themselves with the " 'rebuttable-presumption' standard or the 'shift' theory," under which such a disposition of the collateral would be rebuttably presumed, in the absence of notice to the debtor, to have discharged the debt. See, e.g., Tennant Co. v. Martin's Landscaping, Inc., 40 Conn.Sup. 475, 515 A.2d 665, 668, 2 U.C.C.2d 253 (1986) (citing Norton v. National Bank of Commerce of Pine Bluff, 240 Ark. 143, 150, 398 S.W.2d 538 (1966)). In such circumstances, a secured party seeking further recovery would be obliged to show by the preponderance of the evidence that "the reasonable value of the collateral was less than the outstanding debt." Savings Bank of New Britain v. Booze, 34 Conn.Sup. 632, 382 A.2d 226, 229, 23 U.C.C. 556 (1977); but cf. Hertz Commercial Leasing Corporation v. Dynatron, Inc., 37 Conn.Sup. 7, 427 A.2d 872, 877-79 (1980) (applying New York law).
 
 
 21
 Warnaco contends, however, that it has not disposed of the collateral because even if the new licensing agreement amounted to a conditional sale, it has now been terminated without profit to Warnaco. Moreover, because Robson's role in the negotiation of the DKG licensing agreement may well have satisfied the requirement of notice to Farowa and appellants, findings on that role are necessary. If the district court finds that the DKG agreement was executed without the requisite notice, then the burden is on Warnaco to show that the value of the collateral is less than the debt.
 
 
 22
 On the other hand, if the district court finds that the DKG agreement was executed with notice to the debtors, we believe they cannot now object to its terms. The district court should, however, proceed to determine whether Warnaco benefited from that agreement or, if that agreement was terminated without benefit to Warnaco, whether the trademarks had realizable value after that termination. The district court's inquiry should be governed by the following legal rules.
 
 
 23
 A creditor holding valuable collateral has no right to hold valuable collateral and to collect on the full amount of the debt secured by the collateral. Similarly, a creditor is under no duty to act with regard to collateral that has no realizable value. In light of the failure of appellants to exploit the marks profitably and the apparently unsuccessful attempt by DKG to do the same, we cannot assume that the trademarks had realizable value when the DKG arrangement failed and Warnaco's obligations, if any, to act with regard to the collateral were renewed. The district court should, therefore, conduct a hearing on remand to determine the value of the trademarks.
 
 
 24
 Appellants must prove by a preponderance of evidence the realizeable value, if any, of the trademarks after the DKG arrangement failed. That value should then be deducted from the total of the outstanding debt.
 
 
 25
 We turn now to Farkas's cross-claim on the indemnification agreement. We agree with Judge Carter that Robson's economic duress defense fails. Such a defense must be based on a showing that a party was subjected to a "wrongful threat precluding the exercise of ... free will." Austin Instrument, Inc. v. Loral Corp., 29 N.Y.2d 124, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533 (1971). Cf. Business Incentives Co., Inc. v. Sony Corp. of Amer., 397 F.Supp. 63, 69 (S.D.N.Y.1975). Even assuming Robson's version of events to be true, Farkas did not subject him to any "wrongful threat." Farkas merely acted within his rights as the fifty-percent shareholder of Farowa in adopting no more than "hard bargaining positions" that did not constitute illegal duress. Business Incentives, 397 F.Supp. at 69. The threat of economic losses (much or all of which Robson suffered in any case) hardly deprived Robson of his free will, and he therefore cannot prevail on a duress defense.
 
 
 26
 We turn finally to Robson's fraudulent misrepresentation defense. Although a trial was held, Judge Carter did not make any findings regarding this defense. Accordingly, we remand for such findings.
 
 
 27
 Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.
 
 
 
 [1]
 Conn.Gen.Stat. Sec. 42a-9-504(3) states in pertinent part:
 * * *
 Sale or other disposition [of collateral] may be ... at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor....
 
 
 [2]
 Conn.Gen.Stat. Sec. 42a-9-505(2) states in pertinent part:
 [A] secured party in possession [of collateral] may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor.... If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under section 42a-9-504.
 
 
 [3]
 Conn.Gen.Stat. Sec. 42a-9-501(1) states in pertinent part:
 (1) When a debtor is in default ... [the secured party] may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.
 
 
 [4]
 Conn.Gen.Stat. Sec. 42a-9-507(1) states in pertinent part:
 If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions.