BOATMEN'S FIRST NATIONAL BANK OF KANSAS CITY, a Federally Chartered Bank, Appellee,

v.

P.P.C., INC., a Delaware Corporation, Appellant.

No. 90–1994.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 7, 1991.

Decided March 4, 1991.

---

was no doubt a standard Boatmen's form, as it contains, verbatim, the same key terms and conditions found to be "clear and unambiguous" in *Boatmen's Bank v. Community Interiors, Inc.,* 721 S.W.2d 72 (Mo. Ct.App.1986). However, as often happens when form contracts are casually modified to reflect a specific transaction, the Guarantee also contains the following typewritten insertion in the bottom left-hand corner of the form, next to PPC's signature:

THIS GUARANTEE LIMITED TO 20% OF THE OUT STANDING BORROWING

OF EVANS ELECTRIC CONSTRUCTION, INC.

SECURED BY ACCOUNTS RECEIVABLE

AND INVENTORY AND ONLY THOSE LOANS

SECURED BY ACCOUNTS RECEIVABLE AND

INVENTORY.

Don R. Lolli, Kansas City, Mo., for appellant.

Kip D. Richards, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, MAGILL and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Defendant P.P.C., Inc. ("PPC"), appeals from a district court order granting summary judgment to plaintiff Boatmen's First National Bank of Kansas City ("Boatmen's") in its suit to recover on a written Guarantee. Having concluded that the guarantee contains a material ambiguity that is susceptible of at least two reasonable interpretations, we reverse.

The Guarantee was signed by PPC on September 1, 1987, in consideration of Boatmen's making future advances to Evans Electric Construction, Inc. ("Evans"). The printed portion of the Guarantee document contains typical operative provisions committing PPC to a continuing, absolute, unconditional, unlimited guarantee of all Evans indebtedness to Boatmen's. This

An authorizing Resolution of PPC's Board of Directors which was attached to the Guarantee contained this same limitation.

On June 24, 1988, Boatmen's and Evans entered into a Security Agreement granting Boatmen's a security interest in all Evans' accounts receivable and inventory to secure advances by Boatmen's to Evans. On August 15, 1988, Evans executed and delivered to Boatmen's a demand promissory note in the amount of $1,200,000. It is undisputed that this loan came within both the Security Agreement and PPC's Guarantee.

Boatmen's declared the Evans note due on October 2, 1989, declined to renew it, and demanded that PPC pay 20% of the then unpaid principal and interest. When PPC refused, Boatmen's commenced this diversity action. Promptly upon receiving PPC's answer, Boatmen's moved for judgment on the pleadings, which the district court treated as a motion for summary judgment and ultimately granted. Thus, no formal discovery was conducted and the details of the parties' business relationships remain largely in the shadows.

■ Before the district court, Boatmen's argued, and the district court agreed, that PPC is liable for 20% of the amount owed by Evans on the date of default, $1,153,-019.55.[1] Following Boatmen's declaration of default, however, the balance due on Evans' note was further reduced, to $771,-406.98 as of the day before Boatmen's filed its Complaint, and to $578,681.88 as of April 13, 1990, prior to the grant of summary judgment.[2] Therefore, PPC contended below, and urges on appeal, that it should be liable only for 20% of the *current* outstanding balance ($578,000 as of April 1990). This issue turns on the meaning of the Guarantee's limitation to "20% of the out standing borrowing of Evans."

In construing the Guarantee limitation, the district court relied primarily on *Warnaco, Inc. v. Farkas*, 872 F.2d 539 (2d Cir.1989), one of the few reported cases interpreting a percentage limitation on the amount of a guarantee. In *Farkas*, the corporate purchaser of a business executed a promissory note for $750,000 and its principal owners jointly and severally guaranteed payment of "20% of the amount due under this Note." *Id.* at 541. In defending a suit on the guarantee, the guarantors argued that they had only guaranteed the first $150,000 to be paid under the note; since $140,000 had been paid prior to default, they owed $10,000. The court disagreed, concluding that the phrase "20% of the amount due under this Note" "is clearly a guarantee of a percentage of the total amount"; thus, the guarantors were liable for 20% of the original $750,000 amount of the note, regardless of the $140,000 paid before default. *Id.* at 543.

*Farkas* is not dispositive of this case, however, because PPC's Guarantee is limited to "20% of the *out standing borrowing*." *Farkas* expressly noted that, when the parties substituted the phrase "amount due" for the phrase "outstanding balance," they increased the guarantors' exposure (because partial payments of the note would not reduce the amount of the guarantee until the balance due was less than 20% of the original loan). Here, Boatmen's concedes as much—it contends that PPC owes 20% of the amount due at default, not 20% of the original $1,200,000 loan. Thus, this case turns on a question not addressed by the court in *Farkas*, the temporal meaning of the term "outstanding."

This Court is mindful that, in construing PPC's Guarantee, under applicable Missouri law, the guarantor "is a favorite of the law in this state.... [T]he contract of guarantee must be construed strictly according to its terms, and no stretching or extension of its terms can be indulged.... A guarantor is bound only by the precise words of his contract." *Zoglin v. Layland*, 328 S.W.2d 718, 721 (Mo.Ct.App. 1959). Still, a guarantee agreement is interpreted using the same rules of construction applied to other written instruments, *Kansas City v. Youmans*, 213 Mo. 151, 112 S.W. 225, 228 (1908), and any ambiguity must arise from the guarantee agreement itself, *Boatmen's Bank v. Community Interiors*, 721 S.W.2d at 79.

In addition to relying on *Farkas*, Boatmen's argues that a "fair and reasonable interpretation" of the Guarantee is that PPC is liable for 20% of the outstanding loan balance on the date of default. We agree that is *a* reasonable interpretation, but the threshhold question remains whether the Guarantee contract is ambiguous, so that summary judgment is inappropriate because extrinsic evidence is admissible to show the intent of the contracting parties. That is a question of law which we review *de novo*. *John Morrell & Co. v. Local Union 304A*, 913 F.2d 544, 550 (8th Cir.

---

1. The Guarantee also entitles Boatmen's to recover, and the district court awarded, interest and Boatmen's costs of collection including attorneys fees.

2. Boatmen's asserts that it has not taken "possession" of the collateral, Evans' receivables and inventory, but apparently the loan is being repaid as Evans collects its receivables. Counsel for Boatmen's stated at oral argument that the remaining collateral consists of $98,000 in past-due receivables. If Evans is out of business, as seems to be the case, it is apparent that both PPC and Boatmen's will lose money as a result of the unpaid debt. The question is what amount represents PPC's portion of the loss under the limited Guarantee.

1990); *J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo.Ct. App.1973). "Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper." *Aetna Cas. & Sur. Co. v. Giesow,* 412 F.2d 468, 471 (2d Cir. 1969).

■ We think that a second, equally reasonable interpretation of the Guarantee is apparent when the limitation of "20% of the out standing borrowing" is read in conjunction with the further limitation that the Guarantee only applies to loans "secured by accounts receivable and inventory." The parties suggest radically different interpretations of this second limitation. PPC argues that this phrase required Boatmen's to proceed against the collateral before suing on the Guarantee. However, that construction is squarely in conflict with the Guarantee provision that Boatmen's may proceed against PPC "without first taking any steps against ... any collateral that it may hold." While it may be, as PPC argues, that the typewritten limitation would control the printed form in the case of irreconcilable conflict, we may not create an unnecessary conflict among contract provisions that can be reconciled. If the parties intended to avoid the normal consequences of an unconditional guarantee by making Boatmen's rights subject to it first proceeding against the collateral—a major concession by a lending bank—they should have reflected that intent unambiguously in the Guarantee. *Compare Trenton Trust Co. v. Estate of Maxwell,* 739 S.W.2d 742 (Mo.Ct.App.1987).

■ Boatmen's, on the other hand, asserts that the limitation to secured loans was only intended to protect PPC's right of indemnity against Evans by ensuring that PPC would be subrogated to Boatmen's right to liquidate the collateral. That is a

plausible construction that does succeed in reconciling the Guarantee's provisions. However, where only 20% of the loan is being guaranteed, and where the collateral includes intangibles such as accounts receivable and current assets such as inventory, both of which are apt to lose their value rapidly after a business fails, it is rather predictable that PPC's subrogation right would prove illusory, as is apparently the case here. We should avoid an interpretation of a guarantee term that renders it redundant, illusory or absurd. *See Standard Meat Co. v. Taco Kid of Springfield, Inc.,* 554 S.W.2d 592, 596 (Mo.Ct.App.1977).

■ There is another interpretation of the Guarantee limitation that neither conflicts with Boatmen's collection rights nor confers an illusory benefit on PPC. If "20% of the out standing borrowing" means 20% of the amount due *when PPC pays,* then Boatmen's remains free to pursue the guarantor before realizing on the collateral, but PPC receives 20% of the benefit of any amounts realized on the collateral (or any other loan repayments) in the interim. *Compare Chevron Chem. Co. v. Mecham,* 536 F.Supp. 1036, 1047–48 (D.Utah 1982) (full guarantor is entitled to discharge on his guarantee to the extent that the amount due has been reduced since the date of default). With collateral such as inventory and receivables, a prudent creditor must act promptly to ensure collection; otherwise, the value of these assets may quickly dissipate.[3] Boatmen's, with 80% of the risk, is left in control of the collection process, but PPC is given 20% of the benefit of any realization on the collateral.

Neither the language of the Guarantee nor the abbreviated record before us reveals whether this second interpretation, as opposed to that urged by Boatmen's, reflects the true intent of the parties. Under these circumstances, we conclude that this

---

**3.** Although the defense of impairment of collateral is not available to a guarantor that, like PPC, has agreed to pay regardless of the creditor's use or release of the collateral, the Missouri courts have frequently noted that the creditor still has a duty to the guarantor to act in good faith and with a reasonable degree of care

with respect to the collateral. *See, e.g., Manzo v. Metro North State Bank,* 759 S.W.2d 77, 81 (Mo.Ct.App.1988). Thus, in the context of this case, Boatmen's could not with impunity allow collateral subject to its control to dissipate while it pursued PPC under the Guarantee.

guarantee, like the one at issue in *U.S. Suzuki Motor Corp. v. Johnson,* 673 S.W.2d 105, 107 (Mo.Ct.App.1984), contains "a latent ambiguity for which parol evidence will be admissible to explain the true intent of the parties."

■ Because this case must be remanded, another issue raised on appeal is worthy of brief mention. In December 1987, after PPC signed the Guarantee but before the loan to Evans, PPC wrote Boatmen's a three-line letter stating that, "PPC authorizes the guaranty ... of 20% of outstanding loans *not to exceed $200,000.*" (Emphasis added.) Relying on the provision in the Guarantee permitting it to terminate its obligations as to future advances upon written notice, PPC argues that this letter placed a $200,000 ceiling on its potential liability. The district court rejected this argument, finding no consent to this limitation by Boatmen's and "no provision for unilateral modification" in the contract. Without rejecting the district court's reasoning, we note that a continuing guarantee is normally construed as an offer of a unilateral contract to which performance of the act requested (here, Boatmen's loan to Evans) manifests the requisite consent. *See, e.g., Ralston Purina Co. v. Nabisco, Inc.,* 541 F.2d 679, 684 (8th Cir.1976). Under these circumstances, we think that the parties should be permitted to offer parol evidence as to the circumstances surrounding this letter before a final ruling is made on its legal effect, if any.

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.