The UNIVERSAL CHURCH, Appellant,

v.

Robert L. GELTZER, as Trustee of the
Estate of Darnelle Boisrond,
Appellee.

Docket Nos. 05–1757–BK (L),
05–2105–BK (CON).

United States Court of Appeals,
Second Circuit.

Argued:  Feb. 7, 2006.

Decided:  July 26, 2006.

Gerard A. Riso, Stein Riso Manetel, LLP, (Mark I. Chinitz on the briefs) New York, NY, for Appellant.

Jonathan L. Flaxer, Goldenbock Eiseman Assor Bell & Peskoe LLP (Moshie Solomon on the brief), New York, NY, for Appellee.

Before JACOBS, POOLER, GIBSON,* Circuit Judges.

POOLER, Circuit Judge.

Debtor, Darnelle Boisrond, filed a voluntary petition for Chapter 7 bankruptcy on January 12, 2000, in the United States Bankruptcy Court for the Eastern District of New York (Milton, J.). On or about December 12, 2001, Robert L. Geltzer, the trustee of Boisrond's estate, initiated adversary proceedings against the Universal Church ("the Church") seeking to avoid transfers Boisrond had made to the Church. The bankruptcy court granted partial summary judgment to the Church on the basis that 11 U.S.C. § 548(a)(2), part of the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA"), prevents the trustee from avoiding any transfer to a charitable organization where the individual transfer is

---

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

less than 15 percent of the debtor's income. The only individual contribution exceeding 15 percent of the debtor's income was a 1997 donation of $22,566.97, which the bankruptcy court held the trustee could avoid. On appeal, the district court reversed the bankruptcy court's finding that the 15 percent safe-harbor provision applies to each individual transfer, instead finding it requires consideration of the debtor's aggregate annual contributions. The district court also upheld the bankruptcy court's grant of summary judgment to the trustee on the issue of the debtor's insolvency at the time of transfer and found that allowing avoidance did not violate the First Amendment. The Church then attempted to raise two additional defenses to avoidance in a motion to reconsider, but the district court found these defenses had been abandoned because they were not raised earlier in the appeal.

We hold that (1) the RLCDPA requires consideration of the aggregate annual transfers made by a debtor, rather than each individual transfer, to determine if the 15 percent safe-harbor provision applies, and, (2) because, in each relevant year, Boisrond's donations exceeded 15 percent of her adjusted gross income, § 548(a)(2) does not prevent the trustee from avoiding these transfers. We also vacate the district court's finding that Boisrond was insolvent during the relevant period. We further hold that allowing the avoidance of these transfers does not raise any problems under the Free Exercise or Establishment Clauses of the First Amendment. Finally, as to the Church's other defenses to avoidance, we find the Church waived its claim that the portion of the transfers less than 15 percent of the debtor's income cannot be avoided, but hold that the Church should be permitted to raise the defense of consistency of charitable giving under 11 U.S.C. § 548(a)(2) on remand.

## BACKGROUND

The Church is a not-for-profit corporation organized under the laws of New York and is composed of more than one hundred Christian churches located throughout the United States. The Church is qualified to accept charitable contributions within the meaning of Internal Revenue Code § 170(c).

Boisrond joined the Church in 1997 and attended the location in Brooklyn, New York. She testified at her deposition that the Church had helped her overcome personal problems, and that she had been active in the Church ever since. After Boisrond joined the Church, she began tithing, or giving ten percent of her income to the Church, by making contributions on at least a biweekly basis. She testified that she felt good about the money she gave because it went to help others improve their lives.

From 1993 to 2000, Boisrond made charitable contributions to the Church and other charities as follows:

| Year | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|---|
| Adj. Gross Income | $51,630 | $56,229 | $60,545 | N/A | $65,433 | $66,048 | $68,076 |
| Gifts to the Church | $0 | $0 | $0 | $0 | $47,946.77 | $20,018.31 | $11,012.20 |
| Total Charitable Giving | $4,684 | $3,999 | $115 | N/A | $47,946.77 | $20,018.31 | $15,960.97 |
| % of | | | | | | | |

| Income to Church | 0% | 0% | 0% | 0% | 73.3% | 30.3% | 16.2% |
|---|---|---|---|---|---|---|---|

Most of the contributions to the Church were made in increments of less than $1,500, although a few were far more substantial. The largest single contribution Boisrond made was in 1997, when she made a contribution of $22,566.97 from her savings account.

In the years prior to filing for bankruptcy, Boisrond was earning approximately $65,000 per year working as a nurse for Brookdale Hospital. This job required her to work nights and was very stressful, so, in 2000, Boisrond accepted a less pressure-filled position with a nursing school, earning around $44,000. On January 12, 2000, Boisrond filed a voluntary petition for Chapter 7 bankruptcy. At this time, she had approximately $52,000 in credit card debt and was having difficulty making her credit card payments. The bankruptcy court granted Boisrond a discharge on June 30, 2000.

On December 12, 2001, Geltzer, as the trustee of Boisrond's estate, commenced proceedings against the Church to set aside the contributions Boisrond had made from 1997 to 1999.[1] The parties cross-moved for summary judgment. The bankruptcy court found no material factual dispute concerning Boisrond's insolvency during the relevant years. The court then granted partial summary judgment to the Church, finding that RLCDPA prevents the trustee from avoiding any transfer to a charitable organization where the individual transfer is less than 15 percent of the debtor's income. The bankruptcy court also granted partial summary judgment to Geltzer, finding he could avoid the single individual contribution that exceeded 15 percent of Boisronds's income, the one in 1997 for $22,566.97.

On appeal to the district court, the Church contested the finding that Boisrond was insolvent, argued that Boisrond received fair consideration for her contributions, and contended that requiring the Church to return the contributions would be unconstitutional. Geltzer also appealed, arguing that the RLCDPA 15 percent safe-harbor provision requires consideration of the debtor's aggregate annual contributions, rather than each individual contribution as the bankruptcy court had found. The district court agreed with Geltzer on the aggregation issue and rejected each of the Church's other claims. The Church then attempted to raise two additional defenses to avoidance in a motion to reconsider—(1) that the portion of the transfer less than 15 percent of the debtor's income cannot be avoided, and (2) that none of the transfers could be avoided because Boisrond's charitable giving had been consistent over the years and thus was protected by 11 U.S.C. § 548(a)(2)(B)—but the district court

---

1. When RLCDPA was passed, the Bankruptcy Code provided for only a one year reach-back period, in which the trustee could avoid fraudulent transfers, *see* 11 U.S.C. § 548(a)(1) (2004), but that period has recently been expanded to two years, *see* 11 U.S.C. § 548(a)(1) (2005). However, regardless of the reach-back period under federal law, the Bankruptcy Code allows the trustee to step into the shoes of a creditor under state law and avoid any transfers such a creditor could have avoided. *See* 11 U.S.C. § 544(b). Under New York's Debtor and Creditor Law, a creditor can avoid any transfer made, inter alia, without fair consideration or when the debtor was insolvent. *See* N.Y. Debt. & Cred. L. §§ 273, 274, 278. Thus, the trustee could use New York law to avoid the transfers in 1997 and 1998 if they are not protected by RLCDPA.

found these defenses had been abandoned because they were not raised initially. The Church now appeals both decisions of the district court.

## DISCUSSION

### I. RLCDPA 15 percent safe-harbor provision

■ Section 548(a)(2) of the Bankruptcy Code states: "A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer ... [that may be avoided by the trustee] in any case in which—(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made." 11 U.S.C. § 548(a)(2). We are the first circuit to decide whether this provision applies individually to each charitable contribution or to a debtor's aggregate charitable contributions for the year.

■ Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir.2002). Here the statute uses the singular "transfer" and "contribution," suggesting that contributions should be considered one at a time. The Church argues, and the bankruptcy court agreed, that we should stop there because other sections of the Bankruptcy Code use the plural "contributions" or the word "aggregate," which shows that Congress knew how to use these words when they so desired. *See* 11 U.S.C. § 548(a)(2)(B) (stating that a transfer cannot be avoided if it "was consistent with the practices of the debtor in making charitable contributions."); 11 U.S.C. § 1325(b)(2)(A) (excluding from the defini-

tion of disposable income "charitable contributions ... in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made."); 11 U.S.C. § 547(c)(8) (stating that a transfer cannot be avoided if "the aggregate value of all property that constitutes or is affected by such transfer is less than $600."); *see also In re Hailes*, 77 F.3d 873, 874–75 (5th Cir.1996) (finding 11 U.S.C. § 547(c)(8) requires aggregation).

However, one far more significant provision of the Bankruptcy Code that the bankruptcy court did not mention, but that the district court found dispositive, is 11 U.S.C. § 102(7), which provides that "[i]n this title—... (7) the singular includes the plural." The Dictionary Act contains a similar provision. *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things...."). The Church, relying on two cases regarding the Dictionary Act, argues that we should not apply § 102(7) unless it is necessary to carry out the evident intent of the statute. *See First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 657, 44 S.Ct. 213, 68 L.Ed. 486 (1924) (holding the rule that the singular includes the plural "obviously ... is not one to be applied except where it is necessary to carry out the evident intent of the statute."); *see also Toy Mfrs. of Am., Inc. v. Consumer Prod. Safety Comm'n*, 630 F.2d 70, 74 (2d Cir.1980). It is not clear if this rule inhibits reliance on § 102(7), because that subsection appears within the specific title under consideration; its application is therefore more straightforward.

■ Furthermore, we may look to the legislative history to determine the legislative intent where the plain statutory language is ambiguous or would lead to an absurd result. *See Lamie v. United States*

*Tr.,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004); *Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG,* 335 F.3d 52, 57 (2d Cir.2003); *see also Toy Mfrs.,* 630 F.2d at 74 (considering legislative history to determine whether to apply 1 U.S.C. § 1). Here, even if the text of § 548(a)(2) is not ambiguous when read alone, it is ambiguous when § 102(7) is considered. In addition, if § 548(a)(2) requires consideration of each transfer separately, a debtor could contribute all of her income and assets to charity shortly before declaring bankruptcy, provided that she did so in several separate gifts, none of which was larger than 15 percent of her income. This result would be absurd because it would defeat the entire purpose of allowing trustees to protect and enhance the estate by avoiding transfers made in a specific period of time before the bankruptcy petition is filed. Thus, we look to the legislative history to determine the intent of Congress.

The legislative history of Section 548(a)(2) generally indicates that Congress intended contributions to be considered in the aggregate, not individually. The House Report on RLCDPA explained that:

> The 15 percent safe harbor is necessary to protect the tithing practices of certain religious faiths.[2] It is intended to apply to transfers that a debtor makes on an *aggregate* basis during the one-year reachback period preceding the filing of the debtor's bankruptcy case. Thus, the safe harbor protects *annual aggregate contributions* up to 15 percent of the debtor's gross annual income.

Religious Liberty and Charitable Donation Protection Act of 1997, H.R.Rep. No. 105–556, at 9 (1998) (emphasis and footnote added).

**2.** Tithing is the practice of giving a tenth of one's income. *See Black's Law Dictionary*

In addition, during debate on the statute, the following colloquy occurred between Representatives Nadler and Gekas:

[Mr. NADLER]

Mr. Speaker, I would ask the gentleman from Pennsylvania (Mr. GEKAS) to confirm my understanding as set forth in the committee report that the intent of this provision [§ 548(a)(2)] is to protect qualified contributions of up to 15 percent of the debtor's gross annual income *in the aggregate* for the year in which the contribution was made, and that *we do not intend this language to allow multiple contributions to a given organization or to more than one organization which in the aggregate exceed 15 percent of the debtor's gross annual income* to be protected. Would the gentleman confirm whether this is his understanding as well?

. . .

Mr. GEKAS.

Mr. Speaker, I appreciate the opportunity at this juncture to explain in response to the gentleman's question that this legislation is not intended to diminish any of the protections against pre-petition, fraudulent transfers available under section 548 of the Bankruptcy Code. First, it applies to transfers that a debtor makes, and I emphasize this, *on an aggregate basis* during the one year reach-back period to which the gentleman has referred preceding the filing of the debtor's bankruptcy case.

144 Cong. Rec. H3999–02, H4000—01 (1998) (emphasis added).

Finally, during Senate hearings on the bill, there was testimony that:

1492 (7th ed.1999).

[The Act] creates a "safe harbor" which protects all such transfers up to an *aggregate amount of fifteen percent of the gross annual income* of the debtor for the year in which the transfer is made .... that figure will be sufficient to include the total contributions made in good faith by most Americans to charities and churches in any given year.... At the same time, that amount is not so large as to interfere substantially with a creditor's ability to collect on its claim.... Limiting the safe harbor to fifteen percent is designed primarily as a mechanism to prevent abuse of the provision.

Bankruptcy Issues in Review: The Bankruptcy Code's Effect on Religious Freedom and a Review of the Need for Additional Bankruptcy Judgeships, Subcommittee on Administrative Oversight and the Courts of the Senate Judiciary Committee, 1997 WL 612979 (September 22, 1997) (statement of Todd J. Zywicki, Assistant Professor of Law at Mississippi College School of Law) (emphasis added).

As the Church points out, legislative history is rarely all on one side, and there was also testimony during the Senate hearings that "as drafted, the 15% threshold appears to apply to single contributions-allowing the possibility that multiple contributions, each less than 15% of gross income, could be immunized, even though they exceed 15% of gross income in the aggregate." The Religious Liberty and Charitable Donation Protection Act of 1997, Subcommittee on Administrative Oversight and the Courts of the Senate Judiciary Committee, 1997 WL 612960 (September 22, 1997) (statement of Donald S. Bernstein, National Bankruptcy Confer-

ence). While the testimony before the Senate Committee is somewhat contradictory, testimony is an especially indirect method of deriving the understanding of the legislators, and the other, more probative legislative history, including the House Report, all indicate that Congress intended contributions to be considered in the aggregate. *See Disabled in Action of Metro. New York v. Hammons*, 202 F.3d 110, 124 (2d Cir.2000) (noting that "the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy" are the most "authoritative and reliable materials of legislative history"). Furthermore, the statements against aggregation were made by opponents, rather than sponsors, of the RLCDPA, who had an incentive to exaggerate the perils of the statute. *See id.*

Because we conclude that Congress intended the safe harbor to apply to the aggregate of a debtor's charitable contributions, we apply Section 102(7) in interpreting Section 548(a)(2) in order to effectuate that intent. Therefore, we read Section 548(a)(2) to exempt from avoidance charitable contributions where those contributions do not exceed 15 percent of the debtor's adjusted gross income. Thus, we affirm the district court and hold that the safe harbor under Section 548(a)(2) requires consideration of the debtor's aggregate annual contributions, not each individual contribution.[3]

The Church argues that this holding will lead to unfair results where a debtor makes contributions to more than one charity during the year, which are each individually less than 15 percent of the debtor's income but in the aggregate exceed 15 percent. It is not clear whether in

---

**3.** We are aware that the one other court to consider this issue reached the opposite result, albeit in dicta. *See In re Zohdi*, 234 B.R. 371, 380 n. 20 (Bankr.M.D.La.1999). This decision did not consider Section 102(7) or the legislative history. *Id.* at 376–80, 384. Thus, it does not persuade us.

such a situation the trustee could pick and choose among charities in deciding what transfers to avoid. Because this problem is not implicated by the present case, we need not address it here.

## II. Insolvency

■ In order to avoid the contributions to the Church, Geltzer also had to establish that Boisrond was insolvent at the time the contributions were made. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(I). For this purpose, insolvency is determined by the "balance sheet test," in other words whether the debtor's assets were exceeded by her liabilities at the time of the transfer. See 11 U.S.C. § 101(32)(A); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 174 (Bankr. S.D.N.Y.1998); *In re Durso Supermarkets, Inc.*, 193 B.R. 682, 701 (Bankr. S.D.N.Y.1996).

■ Both the bankruptcy court and the district court granted summary judgment to Geltzer on the issue of whether Boisrond was insolvent at the time of each of her contributions to the Church. That decision was based on the expert report of court-appointed accountant Andrew Plotzker. The Church objected to the admission of the report and presses that objection on appeal. We review the decision to admit or exclude expert testimony for abuse of discretion. *United States v. Cruz*, 363 F.3d 187, 192 (2d Cir.2004). In order to exercise its gatekeeping function with regard to expert testimony, "[t]he

court must … evaluate 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.' " *Id.* (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)); *see also* Fed.R.Evid. 702.[4] Because both lower courts failed to adequately perform this role, we vacate the grant of summary judgment as to insolvency, and remand for the district court to do so.

■ Plotzker's report takes information in the record, including from Boisrond's deposition, tax returns, and bankruptcy petition, and then purports to calculate the debtor's net worth at all relevant times. The district court found reliance on the report to be proper because it only performed simply arithmetic operations based on information already in the record, which the bankruptcy court could have done itself. However, the report also assumes that Boisrond's expenses were essentially the same each year. As far as we can tell, this assumption was without basis in the record. Boisrond was not even asked in her deposition whether her expenses were approximately the same.

Furthermore, contrary to the district court's analysis, the accuracy of this estimate of Boisrond's expenses could impact whether Boisrond was insolvent during the relevant period. Net worth can be extrapolated backwards, starting with net worth at a given time, by subtracting the difference between expenses and income over the interim period.[5] *Cf. Yoon v. Comm'r,*

---

**4.** The Federal Rules of Evidence apply to bankruptcy proceedings by virtue of Federal Rule of Evidence 1101.

**5.** Net worth represents the difference between assets and expenses at a given point in time, whereas income and expenses represent changes in net worth over time. *See* Stanley Siegel and David A. Siegel, *Accounting and Financial Disclosure: A Guide to Basic Concepts* 21 (1983). Because any loss would re-

duce net worth, losses are classified as expenses. Therefore, assuming we know an individual's net worth at a particular point in time, it is possible to calculate net worth at another point in time if we know the individual's income and expenses during the intervening period. For example, if an individual's net worth on January 1, 2005 is $25,000, her income in 2005 is $50,000, and her expenses for the same period are $35,000, then net worth on December 31, 2005 is $40,000. The

135 F.3d 1007, 1009–10 (5th Cir.1998) (explaining how income can be derived from net worth and expenses). Indeed this appears to be the methodology Plotzker used. Thus, a higher net worth will be recorded as of the beginning of a year if expenses greatly exceeded income during the course of that year, such that expenses eroded net worth during that period. Therefore, the district court's attempt to maximize Boisrond's net worth during the relevant period by assuming her expenses were zero during these years represented an erroneous understanding of how the net worth calculation was made. Boisrond could have been solvent during the prior years only if her expenses were very *high* not very *low*.

Therefore, in order to have been solvent at any time during the relevant period, Boisrond would have to have had much higher expenses than those assumed. This is not impossible; it could occur, for example, if a major asset was destroyed, such as a car being totaled or a house burning down. As the above explanation makes clear, contrary to the Church's assertions, by considering all contributions to the Church, Plotzker's analysis did take into account the change in net worth caused by the large contribution to the Church that Boisrond made from savings by considering it as an expense. Thus, the Church has not pointed to any major additional expenses that were not included in Plotzker's calculations. However, the burden to demonstrate insolvency is on Geltzer, not on the Church, thus the absence of contrary information is not necessarily enough to make the assumption that Boisrond's expenses were constant a reasonable one.

Neither the bankruptcy court nor the district court conducted any analysis of the methods used by Plotzker in calculating Boisrond's net worth. Because the methodology used in Plotzker's report and its reliability were not apparent from the report itself, and in fact there appear to be serious questions about the reliability of these calculations, the bankruptcy court abused its discretion by admitting this report without any discussion of these issues. Therefore, we vacate the grant of summary judgment on this issue, and remand for the district court to consider whether it was a reasonable and reliable methodology for calculating net worth to assume that Boisrond's expenses remained the same throughout the relevant years.[6]

### III. Constitutionality of allowing avoidance of transfers to the Church

■ The Church argues that allowing the trustee to avoid these contributions would violate both the Free Exercise and Establishment clauses of the First Amendment. We find these arguments to be entirely without merit.

■ It is well established that a generally applicable law that does not target religious practices does not violate the Free Exercise clause. *See Employment Div. v. Smith*, 494 U.S. 872, 890, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The provisions of the bankruptcy code at issue here permit anyone to give up to 15 percent of her income to a charitable cause of her choice without avoidance of those contributions in a subsequent bankruptcy. The Church does not contend that the law allowing avoidance of transfers was intended to burden religion. In fact, there is no safe harbor at all for non-charitable contri-

---

same calculation can be made working backwards.

**6.** On remand, the district court is free to reopen discovery to address the open factual issues regarding Boisrond's insolvency if, in its discretion, it deems that to be appropriate.

butions; the avoidance principal is generally applicable and religion-neutral. Thus it does not violate the Free Exercise clause, regardless of the burden it may place on the religious practices of those who believe in contributing more than 15 percent of their income to their religion.

For a statute "to be permissible under the Establishment Clause, [it] must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 406 (2d Cir.2001). The secular purpose of the transfer avoidance provisions of the Bankruptcy Code is to protect the interests of creditors against fraudulent transfers. *See Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (noting the purpose of avoidance provisions is to preserve the property of the estate for distribution to creditors). The fraudulent conveyance provision applies equally to religious and non-religious entities, while allowing a limited safe harbor for any charitable contributions, so it neither advances nor inhibits religion. Because prior cases have made clear that entanglement is merely an aspect of the statute's effect, avoidance also does not create an excessive entanglement with religion by requiring religious institutions to return funds previously received. *See Skoros v. City of New York*, 437 F.3d 1, 36 (2d Cir.2006) ("The entanglement of the two becomes constitutionally 'excessive' only when it has 'the effect of advancing or inhibiting religion.'" (quoting *Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997))). Thus, allowing avoidance here does not run afoul of the Establishment clause.

We therefore conclude that the fraudulent conveyance provisions of the Bankruptcy Code raise no constitutional difficulties under either of the religion clauses of the First Amendment.

## IV. Motion to reconsider

In a motion to reconsider before the district court, the Church raised two additional defenses against avoidance of the transfers: (1) only the amount of the transfers exceeding 15 percent should be avoided, rather than the entire transfer, and (2) that under 11 U.S.C. § 548(a)(2)(B) the contributions were consistent with Boisrond's practices in making charitable contributions. The first defense was never raised in the bankruptcy court. The consistency defense was raised in the bankruptcy court, but the bankruptcy court addressed it only as to the single transfer it found avoidable under § 548(a)(2)(A), finding that transfer was not consistent with the debtor's charitable giving practices. The district court declined to grant the motion to reconsider because the Church had abandoned or waived these claims. The Church contends that it had no basis to raise these claims until the aggregate approach was adopted. We review the denial of a motion to reconsider for abuse of discretion. *Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n*, 376 F.3d 102, 104 (2d Cir.2004). We agree with the district court that the first defense has been abandoned, but find that the Church should be permitted to raise the second defense on remand.

As to the argument regarding the portion of the transfers less than 15 percent, "[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir.2005). Nevertheless, an appellate court has discretion to consider arguments not raised below "to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Id.* The

district court is an appellate court with respect to the bankruptcy court here. Because the Church was not entitled to assume it would prevail on the aggregation issue in the bankruptcy court, it has no excuse for failing to raise the argument that avoidance should be limited to amounts over 15 percent of the debtor's gross income in that court. Thus, it was not an abuse of discretion for the district court to refuse to consider this defense on appeal.

■■■■ As to the consistency of charitable giving, unlike the first defense, this issue was raised in the bankruptcy court, although not on appeal to the district court. Generally claims not raised on appeal are deemed abandoned, at least when it is the appellant who fails to do so. *See Morrison v. Johnson*, 429 F.3d 48, 52 (2d Cir.2005) (per curiam) (finding that because "[plaintiff-appellant's] brief on appeal contains no argument as to why the court's dismissal of any of her equal protection claims was incorrect .... we regard any challenge to the dismissal of [these claims] as abandoned"). However, where the appellate court, here the district court, vacates an aspect of the lower court's decision, making dispositive a question not addressed below, the usual course is to remand. *See, e.g., Warnaco, Inc. v. Farkas*, 872 F.2d 539, 541, 546 (2d Cir. 1989). Although it behooves appellees to raise all their defenses on appeal because the appellate court can affirm on any basis supported by the record, even one not relied on by the lower court, *Pollara v. Seymour*, 344 F.3d 265, 268 (2d Cir.2003), we are not aware of any case requiring them to do so.

The issue of consistency only arises under the statute if the contribution exceeds the 15 percent threshold. *See* 11 U.S.C. § 548(a)(2). Whether the contributions are considered individually or in the aggregate could affect whether consistency is considered by looking at individual transfers or the aggregate giving. Thus, because consistency was not directly at issue in the appeal, it would not have been unreasonable for the Church to wait to frame this argument on remand in light of the district court's holding on the aggregation issue, especially considering such a remand is the usual practice. Therefore, the district court abused its discretion in not affording the Church an opportunity to raise this defense, and, on remand, the Church should be permitted to do so.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, as to the aggregation of charitable contributions under § 548(a)(2), the constitutionality of the fraudulent conveyance rules, and the waiver of the argument that portions of the contributions less than 15 percent could not be avoided; vacated in part, as to the grant to summary judgment on insolvency and the waiver of the consistency of charitable giving; and the case is remanded for further proceedings consistent with this opinion.